UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
ELIO MANES,                               :
                                          :
           Plaintiff,                :   CASE NO.: _____
                                          :
  -against-                              :   COMPLAINT
                                          :
REXAHN PHARMACEUTICALS, INC.,             :   DEMAND FOR JURY TRIAL
PETER BRANDT, CHARLES BEEVER,             :
KWANG SOO CHEONG, GIL PRICE,              :
RICHARD RODGERS, LARA S. SULLIVAN,        :
and DOUGLAS J. SWIRSKY,                   :
                                          :
           Defendants.               :
----------------------------------------- X

      Plaintiff Elio Manes ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

      1.    This is an action brought by Plaintiff against Rexahn Pharmaceuticals, Inc. ("Rexahn" or the "Company") and members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Rexahn, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and for breaching their fiduciary duty of candor under Delaware State law. Plaintiff's claims arise in connection with the proposed reverse merger between the Company and Ocuphire Pharma, Inc. ("Ocuphire").

      2.    On June 17, 2020, Rexahn entered into an agreement and plan of merger (the

1

"Merger Agreement"), pursuant to which Razor Merger Sub, Inc., a wholly owned subsidiary of Rexahn ("Merger Sub"), will merge with and into Ocuphire, in an all-stock transaction. In accord with this arrangement, each ordinary share of Ocuphire common stock outstanding will be converted into the right to receive approximately 4.6979 shares of Rexahn common stock (the "Proposed Transaction").

3. Should the Proposed Transaction be completed, the former stockholders of Ocuphire are expected to hold approximately 85.7% of the outstanding shares of Rexahn common stock, and the stockholders of Rexahn are expected to hold approximately 14.3% of the same (the "Exchange Ratio"). Additionally, the holders of Rexahn common stock, as of immediately prior to the completion of the Proposed Transaction, shall be entitled to one contractual contingent value right ("CVR"). The CVR can be exchanged for additional consideration should certain conditions be met (the CVR and the Exchange Ratio together, referred to as the "Merger Consideration").

4. On July 6, 2020, in order to convince Rexahn's public common stockholders to vote in favor of the merger, the Board authorized the filing of a materially incomplete and misleading Registration Statement on Form S-4 (the "Registration Statement") with the SEC. The Registration Statement contains materially incomplete and misleading information concerning.

5. The shareholder vote will be scheduled in the coming weeks, as the Proposed Transaction is expected to close in the second half of 2020 (the "Shareholder Vote"). It is imperative that the material information that has been omitted from the Registration Statement is disclosed to the Company's stockholders prior to the Shareholder Vote so they can properly determine whether to vote for or against the Proposed Transaction.

6. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and

Delaware State law. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Rexahn's public common stockholders sufficiently in advance of the upcoming Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' misconduct.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331 because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. This Court also has jurisdiction over the duty of candor claim pursuant to 28 U.S.C. § 1367.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, the Company's common stock trades on the Nasdaq GS, which is

also headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11. Defendant Rexahn is a Delaware corporation which maintains its principal executive offices at 15245 Shady Grove Road, Rockville, Maryland 20850. Rexahn's common stock is traded on the NASDAQ GS under the ticker symbol "REXN."

12. Defendant Peter Brandt is, and has been at all relevant times, the Chairman of the Board of Rexahn.

13. Defendant Charles Beever is, and has been at all relevant times, a director of Rexahn.

14. Defendant Kwang Soo Cheong, and has been at all relevant times, is a director of Rexahn.

15. Defendant Gil Price, and has been at all relevant times, is a director of Rexahn.

16. Defendant Richard Rodgers, and has been at all relevant times, is a director of Rexahn.

17. Defendant Lara S. Sullivan, and has been at all relevant times, is a director of Rexahn.

18. Defendant Douglas J. Swirsky is, and has been at all relevant times, the President, Chief Executive Officer, and a director of Rexahn.

19. The defendants identified in paragraphs 12 through 18 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Rexahn, the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

A. **Background of the Proposed Transaction**

20.     Rexahn is a clinical stage biopharmaceutical company that has been focused on the development of innovative therapies to improve patient outcomes in cancers that are difficult to treat.

21.     Ocuphire is a clinical-stage ophthalmic biopharmaceutical company focused on developing and commercializing therapies for the treatment of several eye disorders. Ocuphire's pipeline currently includes two small molecule product candidates targeting front and back of the eye indications.

22.     On June 17, 2020, Rexahn and Ocuphire jointly announced the Proposed Transaction. The press release stated as follows:

**Rexahn and Ocuphire Enter into Definitive Merger Agreement**

ROCKVILLE, Md. and FARMINGTON HILLS, Mich., June 17, 2020 (GLOBE NEWSWIRE) -- Rexahn Pharmaceuticals, Inc. (NasdaqCM: REXN) and Ocuphire Pharma, Inc., a privately-held clinical-stage ophthalmic biopharmaceutical company focused on developing and commercializing therapies for the treatment of eye disorders, today announced the companies have entered into a definitive merger agreement under which Ocuphire will merge with a wholly-owned subsidiary of Rexahn in an all-stock transaction. Following closing, which is expected to occur in the second half of 2020, the combined company will change its name to Ocuphire Pharma, Inc. and is expected to trade on the Nasdaq Capital Market under the ticker symbol "OCUP." The combined company will focus on the advancement of its pipeline of ophthalmic drug candidates.

Certain institutional healthcare and other accredited investors, including certain Ocuphire directors and executives, have also committed to invest $21.15 million in a private placement that will close immediately prior to the closing of the merger, assuming the satisfaction or waiver of customary closing conditions. Investors in this pre-merger financing will receive Ocuphire common stock prior to closing, which will convert into Rexahn common stock upon closing of the merger. Additionally, following the closing of the merger, Rexahn will issue to these investors warrants to purchase shares of Rexahn common stock and, potentially, additional shares of Rexahn common stock.

"After completing a comprehensive review of multiple strategic alternatives, we determined that the proposed merger with Ocuphire would provide the best opportunity for Rexahn shareholders moving forward," said Douglas J. Swirsky, President and Chief Executive Officer of Rexahn. "The decision by our management and board to choose Ocuphire to be our merger partner will allow our shareholders to participate in a dynamic company with a robust pipeline, backed by a sizeable commitment from institutional investors to continue the development of multiple drug candidates in a growing ophthalmic market."

Ocuphire has built a pipeline of multiple product candidates with demonstrated clinical activity that target high value markets. Its lead product candidate, Nyxol® Eye Drops ("Nyxol"), is a once-daily eye drop formulation of phentolamine mesylate designed to reduce pupil diameter and improve visual acuity. Nyxol is being developed to treat dim light or night vision disturbances, pharmacologically-induced mydriasis, and presbyopia. Ocuphire's second product candidate, APX3330, is a twice-a-day oral tablet, designed to target multiple pathways relevant to retinal diseases, such as diabetic retinopathy and diabetic macular edema. Ocuphire plans to initiate two Phase 3 registration trials and two Phase 2 trials across four indications in the second half of 2020, expecting top-line results to read out as early as the first quarter of 2021 and throughout the remainder of 2021.

"This merger is transformative for Ocuphire as we look to advance our late-clinical stage small molecule ophthalmic pipeline, with multiple Phase 3 and Phase 2 clinical data catalysts expected in 2021" said Mina Sooch, President and CEO of Ocuphire. "We believe the target product profiles of our two product candidates, Nyxol and APX3330, collectively studied in 18 clinical trials and each with large market potentials, creates an opportunity for Ocuphire to become a leading ophthalmic company focused on improving vision and clarity."

23. In order to effectuate the Proposed Transaction, the Defendants agreed to certain restrictive and preclusive deal protection devices which impede the Company's ability to obtain a better offer or terminate the agreement. For example, the Company entered into a "No Solicitation" provision which prohibits seeking a better offer for stockholders, and the termination payment under the Merger Agreement all but ensures no better offer will be forthcoming. According to the Merger Agreement, should the Company terminate, it may have to pay Ocuphire $750,000.

24. This Transaction comes in the midst of the COVID-19 pandemic, at a time when stocks throughout the world are exceptionally volatile due to great uncertainty and radical

economic change. Piggybacking off the uncertainty of pandemic, the Proposed Transaction may inordinately compensate Ocuphire shareholders and reward the Individual Defendants, all at the expense of the Company's common stockholders. Therefore, it is imperative that stockholders receive the material information (discussed in detail below) that Defendants have omitted from the Registration Statement, which is necessary for stockholders to properly exercise their corporate suffrage rights and in order to cast an informed vote on the Proposed Transaction.

**B.   The Registration Statement Omits Certain Material Information**

25.   On July 6, 2020 Defendants authorized the filing of a materially incomplete and misleading Registration Statement with the SEC. The Individual Defendants were obligated to carefully review the Registration Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Registration Statement misrepresents or omits material information concerning the financial analyses conducted by Oppenheimer, information which is necessary for Rexahn's stockholders to make an informed decision on how to vote their shares, in violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9.

26.   *First*, the Registration Statement fails to disclose the financial projections created by management and relied upon by Oppenheimer in creating its fairness opinion, as well as the Ocuphire's projections, and any *pro forma* projections of the combined company.

27.   These projections are of the utmost importance to stockholders asked to vote on the Proposed Transaction in order to determine whether the Exchange Ratio is truly fair. Indeed, Oppenheimer "reviewed certain financial projections provided to Oppenheimer by Rexahn relating to Rexahn and Ocuphire" and so relied on these projections in its determination of fairness. *See* Reg. Stmt. at 125. Yet, the Registration Statement fails to include *any* of these projections.

7

Stockholders have the right to value their shares, their new potential holdings with Ocuphire, and ultimately in order to determine whether the Merger Consideration is fair.

28. Therefore, the Registration Statement must disclose both the Rexahn and Ocuphire projections, including projected: (i) free cash flow; (ii) net income; (iii) EBITDA; (iv) revenue; (v) and any line-items used in the calculation of free cash flow. As to disclosure of valuation information, projections and valuations must be complete, honest, and accurate. Indeed, Courts routinely find this information to be material, and that these financial metrics to significantly alter the 'total mix' of information made available to stockholders. Defendants have only made drastically incomplete disclosures concerning these projections, and this is a material omission which renders the Registration Statement defective.

29. ***Second***, the Registration Statement misleading states or omits material information regarding the analyses performed by Oppenheimer in rendering its fairness opinion.

30. The Registration Statement completely omits all of Oppenheimer's financial analyses concerning Rexahn, thus rendering the Registration Statement misleading incomplete. Indeed, Oppenheimer created a discounted cash flow analysis based off the Company's projected future cash flows and relied upon it in making its fairness determination. *See* Reg. Stmt. at E-2. Yet, none of the analyses performed on Rexahn are included in the Registration Statement. Defendants essentially ask stockholders to assume, *without providing projections or analyses*, that the Proposed Transaction is fair and withhold information from shareholders the fundamental information needed to arrive at that determination.

*31.* For the financial analyses which are disclosed, pertaining to Ocupire, the Registration Statement also omits material information underlying the analyses. With respect to the *Ocuphire Selected Companues Analysis*, the Registration Statement fails to disclose: (i)

Oppenheimer's assumptions for selecting each of the companies observed; and (ii) the individual metrics for each company observed.

32.     With respect to the *Ocuphire Transactions Analysis*, the Registration Statement fails to disclose: (i) Oppenheimer's assumptions for selecting each of the transactions observed; and (ii) the inputs for each of the transactions observed.

33.     With respect to the *Ocuphire Discounted Cash Flow Analysis*, the Registration Statement fails to disclose (i) the unlevered free cash flows; (ii) the individual inputs and assumptions underlying the discount rate ranges from 12% to 14%; (iii) assumptions concerning the perpetuity growth rates of 1.5% to 2.5%; and (iv) all other inputs and assumptions.

34.     Fairness opinions are fundamental to the M&A process and is ultimately what stockholders rely upon in their determination to vote for or against a transaction. Unfortunately, fairness opinions are also vulnerable to manipulation, which is why it is of the utmost important that stockholders have analyses available—such as those omitted here—to determine whether those metrics are reasonable, or whether they were unreasonably selected in order to obtain a finding of fairness. In valuing transactions such as these, it becomes all the more critical. As one highly respected professor explained in one of the most thorough law review articles regarding the fundamental flaws of fairness opinions, in a financial analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of

> dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78. Therefore, in order for stockholders to determine how to vote they need access to the above information, and the omission of these metrics makes each financial analysis identified inherently misleading.

35. ***Third and finally***, the Registration Statement states that the Company had been contacting other potential bidders and entered into non-disclosures which contained customary standstill agreements. *See* Reg. Stmt. at 106-107. Yet, critically, the Registration Statement fails to disclose whether those standstill agreements contained DADW provisions. The failure to plainly disclose the existence of DADW provisions and confidentiality agreements creates the false impression that any company could have made a superior proposal. If there are confidentiality agreements containing DADW provisions, then those parties could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

36. This information has been found to be material by both California and Delaware Courts. Indeed, Plaintiff's attorneys have obtained injunctions on this very issue. *See e.g., In re Integrated Silicon Solution, Inc. Stockholder Litigation Consolidated Action*, Case No. 1-15-CV-278812 (injunction granted June 16, 2015 for failure to disclose DADW restrictions). Courts have

specifically ruled on this issue and held as to their materiality. For example, the Delaware Court of Chancery granted an injunction in *In re Ancestry.com Inc. S'holder Litig.*, Consol. C.A. No. 7988 (Del. Ch. Dec. 17, 2012), and held that stockholders are entitled to know about DADW clauses, that the Court was "not prepared to allow [the proposed merger] to go to a vote without the stockholders being told about [the DADW clauses]." *Id.* at 228. The Court specifically noted that, without this disclosure, the stockholders were operating under a "false impression that any of the folks who signed the standstill could have made a superior proposal. That's not true. They could only make it by breaching the standstill." *Id.*

37. In sum, the omission of the above-referenced information renders the Registration Statement materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff will be unable to make an informed decision concerning whether to vote his shares, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violation of Section 14(a) of the Exchange Act)**

38. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

39. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Registration Statement or consent or authorization in respect of any security (other than an exempted security) registered

pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

40. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Registration Statement communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

41. The omission of information from a Registration Statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

42. Defendants have issued the Registration Statement with the intention of soliciting the Company's common stockholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding the valuation analyses performed by Oppenheimer in support of its fairness opinion.

43. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to the Company's stockholders although they could have done so without extraordinary effort.

44. The Individual Defendants knew or were negligent in not knowing that the

Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement states that Oppenheimer reviewed and discussed its financial analysis with the Board, and further states that the Board considered the financial analysis provided by Oppenheimer, as well as the fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Oppenheimer's analysis in connection with their receipt of the fairness opinions, question Oppenheimer as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Registration Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

45. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a Registration Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors.

Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

46. Rexahn is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Registration Statement.

47. The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

48. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49. The Individual Defendants acted as controlling persons of Rexahn within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Rexahn, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

50. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading

prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

51. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

52. In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

53. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

54. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT III

**(Against the Individual Defendants for Breach of Their
Fiduciary Duty of Candor/Disclosure)**

55. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's

equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

56. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

57. By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they sought shareholder action, and to ensure that the Registration Statement did not omit any material information or contain any materially misleading statements.

58. As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving and/or causing the materially deficient Registration Statement to be disseminated to Plaintiff and the Company's other public stockholders.

59. The misrepresentations and omissions in the Registration Statement are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

60. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them

from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

      B.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

      C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

      D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 7, 2020

**MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*